[Civ. No. 38153. Second Dist., Div. Four. June 20, 1972.]

CELSO ZAMBRANA, Plaintiff and Appellant, v.
STANDARD OIL COMPANY OF CALIFORNIA et al.,
Defendants and Respondents.

## COUNSEL

Hecker & Kenealy and James N. Kenealy, Jr., for Plaintiff and Appellant.

Lawler, Felix & Hall, Thomas E. Workman, Jr., Belcher, Henzie & Biegenzahn and Leo J. Biegenzahn for Defendants and Respondents.

## OPINION

**FILES, P. J.**—This action was brought to recover damages for personal injuries sustained in an automobile collision. Before trial plaintiff settled with the owner and driver of the other vehicle involved. The case was tried against defendants Standard Oil Company of California and The Firestone Tire and Rubber Company, resulting in a jury verdict for plaintiff. Thereafter, the trial court granted the motion of each of those defendants for a judgment in its favor notwithstanding the verdict, and, in the alternative, for a new trial. Plaintiff is appealing from the judgment and order in favor of each defendant.

At about 5 p.m. on March 24, 1966, a 1960 Ford automobile driven by Karen Meland began to fishtail on the Golden State Freeway. She lost control of the vehicle, which swerved several lanes to the right where it collided with a Ford Econoline van driven by plaintiff, who was injured severely.

At the trial plaintiff contended, and defendants did not dispute, that the cause of the accident was a loss of air from the left rear tire of Karen's vehicle. Each party presented expert testimony as to what caused the tire to lose air. Following the accident the valve stem in the left rear wheel was found to be bent and cracked, and a wheel cover for that wheel was missing. Plaintiff's experts were of the opinion that the brass valve stem had received a blow some time before, bending and weakening it in such a way that normal vibration and wear caused it to break open and release air just before the accident. A defense expert was of the opinion that the tire had lost air due to a nail puncture which occurred shortly before the accident. He testified that metallurgic analysis of the break in the valve stem indicated that there was no progressive or gradual failure, but that it broke as a result of a single blow, probably by the wheel cover as it was dislodged in the collision.

The record shows that on November 7, 1964, Karen purchased four tires at a Firestone store. At the same time, Firestone sold her four metal

valve stems which were inserted in the wheels in place of the rubber valve stems which she had used theretofore. The metal valve extensions which had previously been attached to the rubber stems were retained. Each valve stem projected approximately one-fourth inch through a hole in the wheel cover. The extension brought the exposed portion to one and one-half inches.

On October 12, 1965, Karen purchased and had installed four new tires from a Standard station, which were mounted as replacements for the tires purchased from Firestone. The brass valve stems with extensions were retained and remained on the automobile at the time of the accident. Between the time of the installation and the accident, Karen did not have any work done on the wheels aside from having the pressure checked on the tires about four times.

Plaintiff's theory, as to Standard, was that when the new tires were mounted on October 12, 1965, Standard's employee must have negligently struck the valve stem, bending and weakening it, and that that blow was the proximate cause of the tire failure on March 24, 1966. Plaintiff's theory against Firestone is one of strict liability. Plaintiff contends that the combination of a metal valve stem with a metal extension, which was first installed on the car by the Firestone dealer in 1964, was dangerously defective, even though neither the valve nor the extension was itself defective.

■ The issue here on appeal with respect to the propriety of the grant of judgment notwithstanding the verdict is whether plaintiff's evidence, read in the light most favorable to him was sufficient to support a verdict in his favor. (*Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161].)

*The case against Standard.*

Plaintiff's claim against Standard rests upon the theory that when new tires were mounted on October 12, 1965, one of Standard's employees struck the valve assembly, and that this blow was a proximate cause of the March 24, 1966, tire failure and collision. There is no direct evidence that any Standard employee struck such a blow. There is positive testimony to the contrary. The evidence upon which plaintiff relies is circumstantial.

Plaintiff's expert Jablonsky, expressed the opinion that the stem had been bent by a force moving in towards the axle. He conceded that if a metal hammer had struck a blow hard enough to bend the stem, some mark would appear, and he found no such mark. He said the blow could have been caused by a rubber mallet. Such a mallet was a part of the equipment

of the Standard station where the tires were mounted. Mr. Jablonsky said the effect of such a blow would not necessarily cause a break which would leak air at that time, but the crack would progress through normal vibration.

He also said that at the time he examined the tire there was no puncture which would cause it to lose air. The absence of damage to the wheel indicated to him that the valve stem had broken through immediately prior to the accident; and that the valve stem could not have been broken by the wheel cover flying off in the collision.

Karen testified that after the new tires were mounted by Standard she drove the car approximately 800 miles per month, or in excess of 4,000 miles before the accident occurred. During this period she had had no difficulty with the tires and had had no work done on the tires or wheels except checking air pressure. The tires had not been removed nor had the wheel covers been replaced.

Lewis Collin Moore, another engineer who examined the valve stem on behalf of plaintiff, pointed out that the break in the valve stem was below where the stem projected through the wheel cover. He said, "Well, it seems to me difficult to comprehend a blow that is going to bend that valve stem down below where it is bent when the valve cover is on there and the wheel cover is on there and only a small part of it is sticking out. This is a difficult analysis and is why I came to the conclusion that something more like a blow without the wheel cover or with the wheel cover being placed on there, which would then give a better leverage was what occurred."

■ By giving full credence to the opinions of plaintiff's witnesses, and drawing the inferences most favorable to plaintiff, which tended to indicate that nothing happened to the valve stem except normal vibration in the 5 months and 12 days after it left the Standard station, and that the collision did not break the stem, the jury could rationally conclude that a blow struck at the Standard station was a proximate cause of the accident. The judgment notwithstanding the verdict therefore must be reversed as to Standard.

*New trial for Standard.*

The alternative order of the superior court granted Standard a new trial upon the ground of insufficiency of the evidence to justify the verdict. As a specification of reasons, the order of the court states:

*"As to both defendants:*

"1. The evidence establishes by a preponderance thereof that a puncture in the tire was the sole cause of the accident.

"2. The evidence establishes by a preponderance thereof that the valve stem cracked by reason of a single application of force.

". . . . . . . . . . . . . . . . ."

*"As to the defendant Standard Oil:*

"1. The evidence fails to establish by a preponderance thereof any negligence on the part of any employee of Standard Oil; to the contrary, it establishes that there was none."

■ Plaintiff makes the novel contention that a trial judge who erroneously grants a motion for judgment notwithstanding the verdict is necessarily incapable of determining the sufficiency of the evidence on a motion for new trial. If the trial court did not correctly appraise the sufficiency of the plaintiff's case, counsel asks how the same court could have fairly weighed the evidence on the motion for new trial. No authority is cited for plaintiff's contention that there is some disqualifying inconsistency in hearing and granting both motions.

The short answer is that each of the two motions is decided upon a different standard, and the code plainly contemplates that both should be decided by the judge who presided at the trial. (Code Civ. Proc., §§ 629, 661.)

■ In the case at bench the trial court's specification of reasons for granting a new trial makes it clear that the trial court believed that the testimony of defendant's expert witness as to the cause of the accident was worthy of belief, and that the conflicting opinion of plaintiff's witnesses was not. Defendant's witnesses pointed out a puncture hole in the tire, which plaintiff's witnesses had not found. Dr. Boris Auksman, a former member of the California Institute of Technology faculty and a consultant in the field of mechanical engineering, examined the valve microscopically and testified on behalf of Standard. Plaintiff's expert, Mr. Jablonsky, had not examined the fracture surface. Dr. Auksman explained that if the metal had broken as a result of progressive cracking over a period of time, the fracture surface would show a distinctive type of marking. No such marks were found on the surface. He also was of the opinion that if the stem had received a blow hard enough to crack it at all, "it would have broken right there and then." Furthermore, if the valve

stem had been bent before the collision, it would have been vibrating and rubbing against the edge of the wheel cover, but the condition of the valve stem indicated there had been no such rubbing. Dr. Auksman's opinion was that it was not possible that a blow to the valve stem more than 5 months earlier could have caused the break which immediately preceded the collision. The dislocation of the wheel cover in the accident accounted for the break, in his opinion.

The trial court's order, read in the context of the trial record, is an intelligible compliance with the requirement of section 657 of the Code of Civil Procedure that the order contain a specification of reasons.

In short, the trial court adopted the explanation of Dr. Auksman and rejected as speculative the conclusions of plaintiff's witnesses as to the cause of the accident and the break in the valve stem.

In *Scala* v. *Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359 [90 Cal.Rptr. 592, 475 P.2d 864], a case decided after the motion for new trial was granted in the case at bench, the Supreme Court held insufficient an order which granted a new trial simply upon the statement that the defendant was not negligent and the plaintiff was guilty of contributory negligence. Court of Appeal decisions which had approved specifications couched only in terms of ultimate fact were disapproved. The Supreme Court pointed out (at p. 367) that a trial judge is required "to briefly identify the deficiencies he finds in 'the evidence' or 'the record' . . . ."

In the case at bench the trial court's specification points to the court's view of the evidence in two specific contested subsidiary factual matters, the resolution of which was crucial to the ultimate finding. This specification, read in the light of the record, clearly identifies not only the theories of proof to which the court referred, it also identifies the witnesses which the trial court found credible and those whose opinions it found unsatisfactory. The order could have referred to the evidence in detail, but a longer recital would have been no more informative in disclosing the respect in which the trial court found the evidence insufficient.

The order granting a new trial as to Standard must therefore be affirmed.

*Firestone and strict liability.*

■ Plaintiff's case against Firestone rests exclusively upon a theory of strict liability for defective manufacture or design. Plaintiff contends that when Firestone furnished a brass valve stem and connected it with a brass extension already owned by Karen in 1964, it designed and manufactured a defective assembly. There is no contention that either component was itself

defective. Plaintiff's engineering witness, Lewis Collin Moore, was of the opinion that this all-metal assembly was subject to a kind of injury which would not have occurred to a metal stem without an extension, or to a rubber stem with an extension.

Mr. Moore testified that by attaching a 1½-inch extension to a metal valve stem which sticks out approximately one-fourth inch (1) the unit offered six times the exposure to injury, and (2) the stress created on the valve stem by a given side load at the tip of the extension is four and one-half times as great as the stress created by the same load at the tip of the valve proper. He expressed the opinion that the use of a metal extension on a metal valve stem creates a "defective instrumentality" in that "we have reduced the factor of safety by a factor of 4½. We have put it in a region where reasonable shocks which may be anticipated will overstress the metal and we have increased the exposure of the combination all out of proportion in my opinion to what it was as designed originally."

Karen's testimony as to how she happened to have metal valve stems is brief and uncontradicted. Before she purchased tires from Firestone on November 7, 1964, the car was equipped with rubber valve stems and metal extensions. Her father, who assisted her in the purchase on that occasion, agreed with the Firestone salesman who told them, "They [metal stems] are the strongest you can get." The Firestone dealer then replaced the rubber stems with the brass stems, to which he connected the old extensions. When Karen purchased her new tires from Standard in 1965, she asked the Standard salesman if she should get new valve stems. He looked at them and told her she had the best she could have and he did not recommend any change. Thus the same assembly remained on each wheel until the 1966 accident.

Plaintiff has cited no authority for the application of strict liability to this kind of situation. Under the circumstances shown, Firestone was neither a "designer" nor "manufacturer" of the combination of parts which is said to be "defective."

Where a wheel cover allows the valve stem to project through only a quarter of an inch, an extension serves a useful purpose, which the owner may want to consider. The owner also has the opportunity to choose whether or not he or she prefers a brass valve stem, which may be more subject to breaking than rubber if struck by a particular kind of blow, but which may be less subject to other hazards such as cuts or deterioration. The parts are sold separately and the owner's preference prevails. This situation is not at all comparable to the case where a whole vehicle or a

whole assembly is sold as a unit, the buyer accepting the product as designed by the maker.

Nor is this a transaction in which the seller of the article (in this case the brass valve stem) is under a duty to warn the buyer by reason of dangers in use which are not generally known and recognized. (See *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 53 [46 Cal. Rptr. 552]; Rest.2d Torts, § 402A, com. (j).) One need not be an engineer to discern that a stem one and one-half inches in length offers six times the exposure to accidental blows as a stem one-quarter inch in length; and that a long stem is bent more easily than a short one by force applied laterally at the tip. Plaintiff's expert witness explained these matters elaborately in engineering terms, with impressive reference to the mathematical formulas by which the forces could be measured. But he pointed out no danger in the assembly which would not be obvious to a person of ordinary intelligence.

It is true that under some circumstances strict liability may be imposed upon the seller or manufacturer of a dangerous product even though the danger was obvious to the purchaser. Thus in *Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465 [85 Cal.Rptr. 629, 467 P.2d 229], the manufacturer of an earth-moving machine was held strictly liable to a person injured when the machine backed into him. The defect was in the design which made it impossible for the driver to see a person standing in the path of the machine; and the manufacturer had failed to provide either a system of mirrors or means of warning bystanders. There liability was imposed because the defendant had actually designed and manufactured a machine which was unreasonably dangerous in its intended use. Liability was not based upon the manufacturer's failure to warn the purchaser of the obvious peril.

By reason of the foregoing analysis, it is not necessary to decide here whether plaintiff's evidence was sufficient to support a finding that the assembled valve stem plus extension, if designed and manufactured entirely by one of the defendants, was unreasonably dangerous.

Plaintiff will recover costs against Standard. Firestone will recover costs against plaintiff.

The judgment in favor of defendant Firestone is affirmed. The judgment in favor of defendant Standard is reversed. The order granting Standard

a new trial is affirmed. The part of the order granting Firestone a new trial is moot and the appeal therefrom is dismissed.

Jefferson, J., and Irwin, J.,* concurred.

A petition for a rehearing was denied July 12, 1972, and the opinion was modified to read as printed above. The petition of respondent Standard Oil Company for a hearing by the Supreme Court was denied August 16, 1972.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.