[No. B006144. Second Dist., Div. Seven. June 18, 1985.]

*YONG LEE, Plaintiff and Appellant, v.
ELECTRIC MOTOR DIVISION, Defendant and Respondent.

IN HAK LEE, Plaintiff and Appellant, v.
ELECTRIC MOTOR DIVISION, Defendant and Respondent.

*Reporter's Note: This case was previously entitled "Lee v. Butcher Boy."

COUNSEL

Olan & Friedman and Richard A. Love for Plaintiffs and Appellants.

Murchison & Cumming, Dallas Sacher and Friedrich W. Seitz for Defendant and Respondent.

OPINION

THOMPSON, J.—Plaintiffs Yong Lee and In Hak Lee appeal the adverse summary judgment granted on their consolidated actions seeking to impose liability for personal injury and loss of consortium against defendant com-

ponent part manufacturer, Electric Motor Division, an unincorporated division of Gould, Inc.,[1] who manufactured and supplied the motor installed in the machine that injured Yong Lee.

Plaintiffs purchased a market in Downey, California, and included in the assets purchased was a meat grinding machine (machine) that was designed, manufactured and sold by Butcher Boy and Lasar Manufacturing Company (Lasar). Defendant designed, manufactured, and sold the electric motor to Lasar, who installed it in the machine.

Plaintiff Yong Lee was injured on January 15, 1979, while using the machine to grind meat. Her right hand was caught and crushed in the grinding mechanism, resulting in the amputation of her right hand and part of her forearm.

Plaintiffs filed their respective consolidated complaints for personal injury and loss of consortium based on theories of negligent design, manufacture and failure to warn, strict liability, and breach of warranty, against several parties, including defendant and Lasar.

Defendant's motion for summary judgment was granted on August 30, 1983. Summary judgment was filed on September 16, 1983, and notice was duly served and filed. Plaintiffs appeal from the summary judgment.

We will conclude that no triable issue of fact exists, and affirm the summary judgment.

## SUMMARY JUDGMENT

The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution. (*Eagle Oil & Ref. Co.* v. *Prentice* (1942) 19 Cal.2d 553, 556 [122 P.2d 264].) Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. (Code Civ. Proc., § 437c; *Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822].) The court may not pass upon the issue itself. (*Slobojan* v. *Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 436 [74 Cal.Rptr. 895, 540 P.2d 271].) "[I]f a single issue of fact is found, the trial court is powerless to proceed and must allow such issue to be tried." (*Lynch* v. *Spilman* (1967) 67 Cal.2d 251, 271 [62

---

[1]Defendant was erroneously sued and served as Gould, Inc., and Gould, Inc., dba Century Electric Company. Defendant is the successor corporation of Century Electric Company, the manufacturer of the motor which was installed in the machine that injured plaintiff.

Cal.Rptr. 12, 431 P.2d 636]; *Southern Cal. Edison Co.* v. *Harnischfeger Corp.* (1981) 120 Cal.App.3d 842, 851-852 [175 Cal.Rptr. 67].)

■ "The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory." (*Lipson* v. *Superior Court, supra,* 31 Cal.3d at p. 374.) ■ "In examining the sufficiency of the affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion." (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785].)

■ "The defendant's supporting affidavits are responsive in nature and must necessarily be addressed to the issues raised by the complaint. [Citations.] [¶] ■ In determining whether triable issues are presented, the court may not consider the allegations of the complaint *except to the extent they are not controverted by affidavits on either side.* [Citations.] ■ Before a defendant's motion can be granted, it must clearly appear that the action is without merit, and every reasonable doubt must be resolved in favor of the complaint. [Citations.] 'Thus a plaintiff who has pleaded a cause of action on either of two theories will not be subject to defeat by summary judgment because the defendant has established by an uncontradicted affidavit that *one* of the two theories (but not necessarily the other) cannot be established. The burden is upon defendant to rule out *all possible merit* . . . .' [Citations.] [Italics in original.]" (*Cox* v. *State of California* (1970) 3 Cal.App.3d 301, 309-310 [82 Cal.Rptr. 896].)

■ The placement of the burden of proof at trial does not affect the showing required for a summary judgment. (*Security Pac. Nat. Bank* v. *Associated Motor Sales* (1980) 106 Cal.App.3d 171, 179 [165 Cal.Rptr. 38].) "There is nothing in the [summary judgment] statute which lessens the burden of the moving party simply because at the trial the resisting party would have the burden of proof on the issue[s] on which the summary judgment is sought to be predicated. In such a case, on the motion for summary judgment, the moving party must generally negative the matters which the resisting party would have to prove at the trial." (*Barnes* v. *Blue Haven Pools* (1969) 1 Cal.App.3d 123, 127 [81 Cal.Rptr. 444].)

DISCUSSION

■ ■ ■ Plaintiffs contend that the defective design and manufacture of the motor and the lack of a warning proximately caused Yong Lee's injury because had the motor stopped immediately when turned off,

her injuries would have been less severe. Plaintiffs concede that the accident itself would not have happened if the machine had been designed with a narrower throat or equipped with some type of safety device. Plaintiffs, however, allege that defendant is still liable because the motor could have been built to stop immediately by attaching a brake or clutch.

The issue before us is whether the facts shown here negate any possible proof of a cause of action against defendant for its design and manufacture of the motor and its failure to give a warning.

1. *Defective Manufacture and Design.*

"A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) Our Supreme Court "held in *Cronin* [*Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 (104 Cal.Rptr. 433, 501 P.2d 1153)] that a plaintiff satisfies his burden of proof under *Greenman,* in both a 'manufacturing defect' and 'design defect' context, when he proves the existence of a 'defect' and that such defect was a proximate cause of his injuries." (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 427 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].)

Although plaintiffs have phrased their complaints in terms of both defective manufacture and design, they have not properly alleged a cause of action based on a manufacturing defect. A manufacturing defect is readily identifiable in general, because the defective product is one that "comes off the assembly line in a substandard condition" in comparison with the other identical units. (*Barker, supra,* 20 Cal.3d at p. 429.) Plaintiffs do not contend that the motor, as compared to the other identically manufactured motors, came off the assembly line in a substandard condition. Hence, we find that defendant is entitled to summary judgment as a matter of law on the causes of action based on the allegation of defective manufacture.

Our Supreme Court, in *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 429-430, established two alternative tests for determining whether a product is defectively designed. Under the first test, "a product may be found defective in design if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." Under the second test, "a product may be found defective in design even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other

words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design."

■■ "A component part manufacturer may be held liable for damages caused by a component part which was defective at the time it left the component part manufacturer's factory. [Citations.]" (*Wiler* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 629 [157 Cal.Rptr. 248].) ■■ In reliance on this rule, defendant claims it is insulated from liability for defects caused by Lasar's subsequent alleged negligence in the design and manufacture of the machine because there was no defect in the motor at the time the motor left defendant's plant. We agree.

Defendant has shown the following facts: William Lasar, a mechanical engineer and the manager of Lasar, was solely in charge of Lasar's design and manufacture since 1922. Mr. Lasar testified that he did not specifically recall buying motors from defendant that were custom built for this particular machine, although he did recall purchasing specially ordered motors for customers in states with lower voltage. He further stated that the motors he bought from defendant were ordinary, off-the-shelf motors, that were "standard items" and "nothing special."

Plaintiffs argue that an issue of fact exists because Mr. Lasar's deposition testimony created an inference that defendant helped him to design the machine. Plaintiffs rely on Mr. Lasar's testimony that he bought motors from defendant "right from the beginning," in 1922, and that he had discussions with Jim Fryer, an employee of defendant's predecessor, Century Motors:

"A. In '54 they had an agent. Century Motors had an agent on Industrial Street, a man named Jim Fryer. He was the distributor or the agent in that area. And we placed our orders with Jim Fryer.

"Q. Would you tell Mr. Fryer what type of motor you wanted and how many? Is that how you would order them?

"A. Yes.

"Q. Did you ever talk with Mr. Fryer about the use that the motor would be put to?

"A. Oh, yes.

"Q. Can you recall any discussions that you had with Mr. Fryer regarding how you intended to use the motors?

"A. Well, he knew I needed it for meat grinders, meat saws, and other items. You just don't buy a motor for a grinder. You buy a motor for all kinds of equipment. We have 54 different items.

"Q. Did you ever have any conversations with Mr. Fryer regarding the type of motor that should be used on a particular type of machine that you would produce?

"A. Yes. A motor is a motor, single-phase, three-phase, voltage. I wouldn't order anything from Mr. Fryer unless I know the motor that I ordered. I know what I want. I am not asking them for any advice. I tell them what I want. We have to go by an order from a customer.

"A customer is the one that decides what you need. A customer will say, 'I want such and such a motor in my machine.' I have to provide the machine with that motor. So it's a reverse from what you—he is not selling to me. I am only buying from him."

 However, "[i]t is settled that where the evidence raises an inference that a fact exists, and either party produces evidence of the nonexistence of the fact that is clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved, the nonexistence of the fact is established as a matter of law." (*Leonard* v. *Watsonville Community Hosp.* (1956) 47 Cal.2d 509, 515 [305 P.2d 36].) Even if we accept plaintiffs' argument that the inference of defendant's design role may be logically and reasonably drawn from this evidence (Evid. Code, § 600, subd. (b)), we conclude, without shifting the burden of proof thereby, that the inference is dispelled as a matter of law by Mr. Lasar's testimony that he knew what he wanted, did not ask for any advice, and told defendant what he wanted.

We have found no case in which a component part manufacturer who had no role in designing the finished product and who supplied a nondefective component part, was held liable for the defective design of the finished product. To the contrary, the cases relied on by defendant demonstrate a reluctance against imposing liability in this situation.

In *Zambrana* v. *Standard Oil Co.* (1972) 26 Cal.App.3d 209 [102 Cal.Rptr. 699], the plaintiff was injured when his car was struck by another vehicle that went out of control due to a sudden loss of tire pressure. The accident allegedly occurred when a metal valve stem and metal extension assembly on the tire broke. The plaintiff sued the manufacturer and retailer of the tire, Firestone, for defective manufacture or design of the metal valve stem. Firestone did not manufacture or sell the metal extension, which the purchaser of the tire had previously bought elsewhere. The plaintiff did not

contend that either component in and of itself was defective, but that the combination of the two metal parts was dangerous.

The *Zambrana* court granted Firestone's motion for summary judgment, stating: "Plaintiff has cited no authority for the application of strict liability to this kind of situation. Under the circumstances shown, Firestone was neither a 'designer' nor 'manufacturer' of the combination of parts which is said to be 'defective.'" (*Zambrana, supra,* 26 Cal.App.3d at p. 217.) The court noted that Firestone simply provided the purchaser who desired to use a valve stem extension, a choice between rubber and brass valve stems.

*Wiler* v. *Firestone Tire & Rubber Co., supra,* 95 Cal.App.3d 621, and *Fierro* v. *International Harvester Co.* (1982) 127 Cal.App.3d 862, 869 [179 Cal.Rptr. 923], further support defendant's claims that it reasonably relied on Mr. Lasar, a mechanical engineer who designed and produced these machines since the early 1920's, to take appropriate measures to properly design and manufacture the machines. In *Wiler, supra,* 95 Cal.App.3d 621 plaintiffs, the widow and daughter of the driver of an automobile killed when his auto left the road, sought damages against Firestone for an allegedly defective tire. The trial court granted summary judgment for Firestone, on the ground that the sole defect in the tire was in the valve stem manufactured and attached to the tire by the Ford Motor Company. The Court of Appeal affirmed, concluding that Firestone could not be held liable for Ford's negligence or for a defect in Ford's product, because the tire was not defective when it left Firestone's factory. (*Wiler* v. *Firestone Tire & Rubber Co., supra,* 95 Cal.App.3d 621, 629, citing *Zambrana* v. *Standard Oil Co., supra,* 26 Cal.App.3d 209, 216-219, and *McGoldrick* v. *Porter-Cable Tools* (1973) 34 Cal.App.3d 885, 888 [110 Cal.Rptr. 481]; see also *Edison* v. *Lewis Mfg. Co.* (1959) 168 Cal.App.2d 429, 436-442 [336 P.2d 286].) The *Wiler* court found that Firestone, "[i]n dealing with an automotive manufacturer which designs and produces automotive products . . . could reasonably believe Ford Motor Company would take appropriate measures to insure proper design and installation of the valve stem." (*Wiler* v. *Firestone Tire & Rubber Co., supra,* 95 Cal.App.3d at p. 629.)

Similarly, in *Fierro* v. *International Harvester Co., supra,* 127 Cal.App.3d 862, 869, the court stated that the component part manufacturer of the fuel tank installed in the truck manufactured by Luer, "could reasonably expect that Luer would take appropriate measures to insure proper design to cover and protect the fuel tanks."

We find the above cases relied on by defendant to be analogous and persuasive authority. The evidence establishes that defendant had no role in the

design of the machine, and that defendant reasonably relied on Lasar to take appropriate measures to insure proper design and installation of the motor. We conclude that defendant's manufacture or design of the nondefective motor could not have proximately caused the injury.

Plaintiffs' reliance on *DeLeon* v. *Commercial Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336 [195 Cal.Rptr. 867], is misplaced. *DeLeon* does not impose a duty upon the manufacturer of a nondefective component part product to investigate the safety of the finished product that was solely designed and manufactured by another manufacturer. In *DeLeon,* the injured plaintiff urged "facts showing the [manufacturer of the finished product] relied on the expertise of [the defendant component part manufacturer] when it invited [the defendant's] employees to come to the plant to view the proposed bin configuration and to construct it properly as a part of the ongoing plant operation." (148 Cal.App.3d at p. 343.) The *DeLeon* court thus concluded that the case was not "a clear-cut legal question of component part liability, but instead [presented] a factual issue of involvement in design which will permit variations in the applicable rules of law depending upon how the trier of fact determines the extent of [the component part manufacturer's] design responsibility." (*Ibid.*) The facts of this case are markedly different. Unlike *DeLeon,* here defendant had no design role in making the finished product. It is uncontradicted that the motors purchased from defendant were standard shelf items, and that Mr. Lasar, the sole designer of the machine, sought no advice from defendant, but instead told defendant which motors he desired to purchase.

### 2. *Failure to Warn.*

The manufacturer of a product may be held strictly liable and the product deemed defective, for the manufacturer's failure to warn: "[A] manufacturer or a supplier of a product is required to give warnings of any dangerous propensities in the product, or in its use, of which he knows, or should know, and which the user of the product would not ordinarily discover. [Citations.]" (*Groll* v. *Shell Oil Co.* (1983) 148 Cal.App.3d 444, 448 [196 Cal.Rptr. 52].)

Even if the product is faultlessly made, it may be found defective if it is unreasonably dangerous when placed in the hands of the user without adequate warnings. (*Cavers* v. *Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338, 347 [157 Cal.Rptr. 142].) Although it is no longer necessary to show both a defect and a resulting unreasonable degree of danger arising therefrom to recover for defective manufacture or design (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413; *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153]), the

test of liability for failure to warn still contains a standard of reasonableness. It is permissible to instruct the jury in a failure-to-warn case to consider such things as "the normal expectations of the consumer as to how the product will perform, degrees of simplicity or complication in the operation or use of the product, the nature and magnitude of the danger to which the user is exposed, the likelihood of injury, and the feasibility and beneficial effect of including a warning. [Citations.]" (*Cavers* v. *Cushman Motor Sales, Inc., supra,* 95 Cal.App.3d 338, 348.)

 On a motion for summary judgment in a case involving the manufacturer's failure to warn, the burden rests upon the moving party to show the absence of triable issues of fact concerning the existence of dangerous propensities in the product which the manufacturer knew or should have known, and which the user would not ordinarily discover.

 We find this case to be factually analogous to *Zambrana* v. *Standard Oil Co., supra,* 26 Cal.App.3d 209. The *Zambrana* court, in reviewing the summary judgment granted to defendant Firestone, concluded that the purchaser of the component-part metal valve stem exercised free choice in selecting that stem rather than a rubber stem. There was, as in this case, no allegation that the component-part metal valve stem was in itself defective. The plaintiff, as here, contended that it was the combination of the parts that was unreasonably dangerous. The *Zambrana* court refused to impose liability against the component-part manufacturer for failing to warn the purchaser: "Nor is this a transaction in which the seller of the article (in this case the brass valve stem) is under a duty to warn the buyer by reason of dangers in use which are not generally known and recognized. [Citations.] One need not be an engineer to discern that a stem one and one-half inches in length offers six times the exposure to accidental blows as a stem one-quarter inch in length; and that a long stem is bent more easily than a short one by force applied laterally at the tip. Plaintiff's expert witness explained these matters elaborately in engineering terms, with impressive reference to the mathematical formulas by which the forces could be measured. But he pointed out no danger in the assembly which would not be obvious to a person of ordinary intelligence." (*Id.,* at p. 218.)

Similarly in this case, there is nothing to indicate that the motor in its use had unreasonably dangerous propensities not ordinarily discoverable by the user. The uncontradicted evidence shows that all motors, even "brake motors," do not stop immediately.[2] There is no danger in the motor which would not have been obvious to a person of ordinary intelligence.

---

[2]Mr. Lasar testified: "The switch is off, but the motor stops within five or seven seconds, something like that." He further testified: "You cannot stop anything to a dead stop im-

Moreover, we stress that defendant gave no input and had no control over the design, manufacture, and packaging of the finished product. The cases relied on by defendant demonstrate a reluctance against imposing liability for the component-part manufacturer's failure to warn the consumer where the final product is subsequently packaged, labeled and marketed by another manufacturer. (*Walker* v. *Stauffer Chemical Corp.* (1971) 19 Cal.App.3d 669 [96 Cal.Rptr. 803]; *Groll* v. *Shell Oil Co., supra,* 148 Cal.App.3d 444.)

In *Walker,* the plaintiff was injured by "Clear-All," a drain cleaning product containing sulfuric acid. The plaintiff sued Stauffer, the component-part manufacturer of sulfuric acid, in strict liability for failure to warn. Stauffer successfully moved for summary judgment, and the appellate court affirmed. *Walker* stated that it is not "realistically feasible or necessary to the protection of the public to require the manufacturer and supplier of a standard chemical ingredient such as bulk sulfuric acid, not having control over the subsequent compounding, packaging or marketing of an item eventually causing injury to the ultimate consumer, to bear the responsibility for that injury. The manufacturer (seller) of the product causing the injury is so situated as to afford the necessary protection." (*Walker* v. *Stauffer Chemical Corp., supra,* 19 Cal.App.3d 669, 674.)

■ We agree with the *Walker* court that the manufacturer of the finished product is in the best position to protect against and warn of the danger that arises after the nondefective component part is installed in the finished product. And, as noted in *Walker:* "We are referred to no California case, nor has independent research revealed any such, extending the strict liability of the manufacturer (seller) to the supplier of a substance to be used in compounding or formulating the product which eventually causes injury to an ultimate consumer. On the contrary this dearth of authority indicates to us a reluctance on the part of the bench and bar to consider such an extension necessary or desirable for the protection of the ultimate consumer." (*Id.,* at p. 673.)

■ Accordingly, we conclude that defendant owed no duty to plaintiffs to warn that the motor did not stop immediately.

---

mediately. Even brake motors, anything, it would take five to seven seconds to stop." Also, "The feed screw turns around 250 RPM, and when you calculate seven seconds, how many turns, you would have your arm into there (indicating). There is no way to stop it."

We reject plaintiffs' argument that Mr. Lasar's testimony creates a triable issue of fact concerning whether he knew that the motor did not stop immediately. While he did at first respond affirmatively to the question of whether the motor stopped "immediately," his clarifying responses to subsequent questions showed that he meant that the motor stopped within five to seven seconds.

The summary judgment is affirmed.

Lillie, P. J., and Johnson, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 29, 1985. Bird, C. J., was of the opinion that the petition should be granted.